EMMA McDOUGALD et al., Respondents-Appellants, v SARA GARBER et al., Appellants-Respondents.

First Department, January 28, 1988

## APPEARANCES OF COUNSEL

*Thomas A. Moore* of counsel *(Kramer, Dillof, Tessel, Duffy & Moore,* attorneys), for respondents-appellants.

*Luke M. Pittoni* of counsel *(Heidi A. Fuhrman* with him on the brief; *Heidell Pittoni, Murphy & Bach, P. C.,* attorneys), for Ella Garber, appellant-respondent.

*Michael A. Ellenberg* of counsel *(Ellen August* and *Bert H. Ware* with him on the brief; *LeBoeuf, Lamb, Leiby & MacRae,* attorneys), for Sonia Armengol and others, appellants-respondents

*Howard R. Cohen* of counsel *(Steven J. Ahmuty, Jr.,* and *Carol R. Finocchio* with him on the brief; *Bower & Gardner,* attorneys), for New York Infirmary, appellant-respondent.

### OPINION OF THE COURT

SULLIVAN, J.

This appeal presents the question of whether loss of enjoyment of life is an element of damages separate and distinct from conscious pain and suffering, and compensable even without the injured party's cognitive awareness of his physical condition. The issues appear never to have been directly addressed by an appellate court of this State. Mindful but wary of the precedent which will be established, we find that loss of enjoyment is a damage element separate and distinct from pain and suffering, for which compensation may be awarded despite the injured party's lack of cognitive awareness.

On September 7, 1978, while undergoing an elective Caesarean section and tubal ligation at New York Infirmary, plaintiff Emma McDougald, then 31 years of age, became anoxic (oxygen deprived) and suffered severe diffuse brain damage after being delivered of her second child, a girl, born healthy. Plaintiff lapsed into a comatose condition and has since remained in a vegetative state. She is a permanent spastic quadriplegic with incontinence of urine and feces. In this lawsuit she and her husband, suing derivatively, charged the defendants, the obstetrician/gynecologist-surgeon at the subject procedure, the anesthesiologists and the hospital, with various acts of malpractice. The jury returned a verdict in their favor in the amount of $11,150,102, collectively, which was reduced by the trial court to $6,296,728. Liability is unchallenged on appeal, except for a claim by one of the defendants, Dr. Garber, the surgeon, that plaintiff was permitted to offer proof of fault on theories never raised in the complaint or bill of particulars. All the other issues relate to the question of damages.

One of the sharply contested factual issues at trial was whether plaintiff had any cognitive awareness of her condition. It is undisputed that she is unable to communicate or respond to verbal commands. She breathes through a tracheostomy, an opening into the trachea, and is fed through a nasogastric tube. Most of the time her neck is extended, her back arched and knees straight, her ankles and feet pointed, and her wrists turned inward.

Plaintiff's expert, Dr. Lawrence Kaplan, a board-certified neurologist, evaluated plaintiff twice. In his first examination, conducted on March 13, 1979, six months after the anoxic episode, he found her neurologically comatose. She was totally unresponsive to verbal stimuli. She did not communicate in any way, and, although her eyes were open during the examination, she was unable to follow Dr. Kaplan's finger. She did, however, respond to painful stimuli by withdrawing or grimacing when Dr. Kaplan touched her with a pinprick or pressed the superorbital margin, the nerve route above the eyebrow. Dr. Kaplan concluded that plaintiff suffered severe brain damage of the cortex, the center for logical reasoning, and the brain stem, which, with other elements of the autonomic nervous system, controls respiration, cardiovascular and gastrointestinal function and swallowing and chewing. Both Dr. Kaplan and the defendants' expert agreed that, despite loss of cognitive ability, brain stem function permits both vegetative and reflexive, automatic motor activity. Given the six-month time lapse since the initial episode, Dr. Kaplan considered the prognosis for recovery as "hopeless" and characterized plaintiff's condition as "permanent".

On June 21, 1985, more than six years after his first examination and six months prior to trial, Dr. Kaplan again examined plaintiff, after it had become clear that the defendants would contend that, lacking any cognitive awareness, she was precluded from recovering damages for either pain and suffering or loss of enjoyment of life. Dr. Kaplan again determined that plaintiff suffered severe cortical and brain stem damage. Although plaintiff did not speak or communicate verbally, she was, according to Dr. Kaplan, "able to follow my voice with her eyes", a phenomenon which he described as "a certain amount of tracking ability", but which he did not interpret as a cognitive function. At times, her eyes seemed to follow Dr. Kaplan's finger when he moved it up and down in front of her. The eye movement, however, was neither regular nor consistent.

Dr. Kaplan could not, as of the time of this second examination, state with a reasonable degree of medical certainty whether plaintiff, on command, would have been able to raise her head, hand or arms. Her posture, although still decerebrate, was less severe. She smiled on several occasions after being caressed by her husband. Dr. Kaplan could not determine whether the smile was in response to something the husband said or to tactile stimuli. Although he still found her severely and permanently brain damaged with brain stem involvement, Dr. Kaplan opined that plaintiff had a certain amount of awareness of her surroundings, notwithstanding her inability to communicate. He admitted that whatever awareness plaintiff had would be the lowest form of cognition.

On September 17, 1985, three months after his second examination, Dr. Kaplan prepared a report of his findings in which he concluded that plaintiff had displayed a primitive but improved and purposeful response to stimulation. Plaintiff's counsel, however, failed to serve a copy of the report on the defendants until the first day of trial, four months later, after a jury had been selected. The defendants immediately moved to preclude both Dr. Kaplan's testimony with respect to his findings at the time of the second examination and the report itself, on the grounds of the untimely service of the report and the undue prejudice they would suffer by the receipt of such evidence, since they had prepared for trial and selected a jury on the assumption that plaintiff would not elicit any testimony to contradict the conclusions of all the examining physicians, who had found her comatose and without any awareness or consciousness. After reserving decision on the motion until the witness was called, the court, approximately three weeks later, over the defendants' objections, permitted Dr. Kaplan to testify as to his findings on the second examination and allowed the report itself to be received in evidence.

Other evidence was offered as to plaintiff's cognitive awareness. Her husband, who had visited her 5 to 7 times a week throughout the seven years since the September 7, 1978 incident, began to observe changes about a week after she had been moved from the intensive care unit. When he called her name, for instance, she would stare at him, and "sometimes it looked like she was trying to talk to me". Her eyes would follow him as he moved from one side of the bed to the other. She would smile when he stroked her face or spoke to her. She sometimes opened her eyes when he entered the room.

She would lift her head and arm when he washed her. She responded to noise.

Plaintiff's sister, who cares for the children on weekdays, visited her every two weeks. Plaintiff's eyes would follow her sister as she walked from one side of the bed to the other; plaintiff would react to the mention of her mother's name, or her husband's or that of her older child; she was sensitive to touch, sometimes frowning when her sister combed her hair.

The nurses' notes from the hospital record in 1980 and 1984/1985 contained such observations of plaintiff as "awake", "responsive", "alert", "visited by relative, appeared aware of presence, turned and opened eyes", and "responsive to touch stimuli". Even Dr. Kaplan, however, could not exclude the possibility that these notes were the product of "wishful thinking", or represented clinically imprecise observations.

The defendants' expert, Dr. Sobin, also a board-certified neurologist, examined plaintiff on April 14, 1982 and found that, while she made limited responses to sight and tactile stimulation, these responses were reflexive and not conscious. He observed plaintiff smile slightly when her husband, who was present, stroked her face or kissed her lightly on the cheek. This, however, did not indicate a higher cognitive function; rather, since plaintiff did not always similarly respond, Dr. Sobin concluded that stimuli was getting through only sporadically and in a "primitive manner" to the lower areas of the brain. Plaintiff was unable to follow Dr. Sobin's verbal commands to open her eyes or mouth. Nor did she attempt to speak.

Finding that plaintiff suffered diffuse bilateral damage deep within the cerebral hemispheres as well as in the layers of the cortex, Dr. Sobin concluded that she had a marked impairment of the various mental processes, including thought, memory and comprehension, reasoning and emotional activity. He testified that those functions he did observe were controlled by the brain stem, which also showed impairment, and were purely reflexive. He found plaintiff incapable of having any cognitive awareness of pain and suffering or of her state of life in her hospital bed, but conceded that she would fluctuate between different degrees of responsiveness.

The court's charge included a lengthy explanation as to each of the 59 special interrogatories which it submitted. As to damages for pain and suffering and loss of enjoyment of life, the court charged:

"In this case, however, because of a dispute with respect to the level of Emma McDougald's perception, it is, in my view, necessary to consider pain and suffering separate from the loss of enjoyment of life. Conscious pain and suffering means just that. It means pain and suffering of which the injured person is aware. Physical pain is the physiological response of the body to illness or injury. It requires at least some level of awareness. It requires that the injured person experience some unpleasant or painful sensation.

"If you conclude that Emma McDougald is so neurologically impaired that she is totally incapable of experiencing any unpleasant or painful sensation, then, obviously, she cannot be awarded damages for conscious pain.

"I am not going to review the conflicting testimony that you have heard of two neurologists who testified. There were many references made to the hospital record. It is for you to determine the level of Emma McDougald's perception and awareness. Suffering relates primarily to the emotional reaction of the injured person to the injury. Thus, for an injured person to experience suffering, there, again, must be some level of awareness. If Emma McDougald is totally unaware of her condition or totally incapable of any emotional reaction, then you cannot award her damages for suffering. If, however, you conclude that there is some level of perception or that she is capable of an emotional response at some level, then damages for pain and suffering should be awarded * * *

"Now 58-g is a separate item, it is referred to as loss of the pleasures and pursuits of life. Damages for the loss of the pleasures of and pursuits of life, however, require no awareness of loss on the part of the injured person. Quite obviously, Emma McDougald is unable to engage in any of the activities which constitute a normal life, the activities she engaged in prior to her injury * * * Loss of the enjoyment of life may, of course, accompany the physical sensation and emotional responses that we refer to as pain and suffering, and in most cases it does. It is possible, however, for an injured person to lose the enjoyment of life without experiencing any conscious pain and suffering. Damages for this item of injury relate not to what Emma McDougald is aware of, but rather to what she has lost. What her life was prior to her injury and what it has been since September 7, 1978 and what it will be for the rest of her life."

The jury awarded plaintiff damages in the sum of

$9,650,102, including $1,000,000 for conscious pain and suffering and $3,500,000 for loss of the pleasures and pursuits of life. Her husband was awarded $1,500,000 on his claim for loss of services. In their posttrial motions the defendants asserted a claim of error in the court's submission of loss of enjoyment of life as an item of damages separate and distinct from pain and suffering, and further, that plaintiff could not recover for pain and suffering or loss of enjoyment of life because she was not cognitively aware of her circumstances. The court reduced plaintiff's damages to $4,796,728, striking the entire award of $2,353,374 for future nursing care as not supported by the evidence and diminishing, as excessive, the awards for conscious pain and suffering ($1,000,000) and for loss of enjoyment of life ($3,500,000) to $2,000,000, collectively (132 Misc 2d 457). The derivative award to the husband was not disturbed. Plaintiff has stipulated to the court's reduction of the damage award, and judgment was entered accordingly.

Plaintiff has appealed from those parts of the order and the judgment which reduced damages, while the defendants seek a further reduction, and specifically seek elimination of the award for loss of enjoyment of life. They also challenge the propriety of allowing a recovery for loss of enjoyment of life separate and in addition to an award for pain and suffering. Although the defendants have not challenged plaintiff's cross appeal, it should nonetheless be dismissed, except for the challenge to the elimination on legal grounds of the award for future nursing care, since plaintiff, having stipulated to the reduction of damages, is not an aggrieved party for the purpose of appeal. *(See, Dudley v Perkins,* 235 NY 448, 457; *also, Smith v Hooker Chem. & Plastics Corp.,* 69 NY2d 1029; CPLR 5511.)[1]

We affirm and take this opportunity to address the questions of whether separate awards may be made for conscious pain and suffering and loss of enjoyment of life, and whether cognitive awareness is a prerequisite to a recovery for the latter.[2] We note at the outset that our exploration of these

1. We are, however, impowered to reach the issue of the reduction of damages on the defendants' appeal from the judgment. *(See,* CPLR 550 [a] [5].) We find the argument as to the inadequacy of the awards, as reduced, to be without merit.

2. In an exercise of its discretion under section 500.17 of the Rules of the Court of Appeals (22 NYCRR), the Court of Appeals recently declined to accept two questions certified to it by the United States Court of Appeals for the Second Circuit in an action under the Federal Tort Claim Act. *(Rufino v United States,* 69 NY2d 310.) The questions posed were precisely the issues here—whether loss of enjoyment of life is seperately compensable from pain

issues is not to be construed as a finding that, as a matter of law, plaintiff does not have any cognitive awareness. In support of the jury's finding on that issue we think sufficient is found in the record. Dr. Kaplan's opinion evidence, as well as the husband's testimony that plaintiff's eyes followed him as he moved from one side of the bed to the other, and the attending nurses' notes, which found her "responsive" and "alert" on numerous occasions, provide a foundation for the verdict.

Loss of enjoyment of life as an element of damage in a personal injury action was discussed in New York, at least as long ago as 1857, when the Court of Appeals stated: "The law guaranties to every person the right of personal security, which includes the uninterrupted enjoyment of his life and limbs, of his health and reputation; and he who, by a wilful or by a culpably negligent act, deprives him of these blessings, or interferes with the full enjoyment of them, subjects himself * * * to the liability of making compensation in damages to the aggrieved party." *(Ransom v New York & Erie R. R. Co.,* 15 NY 415, 416.) Subsequent authority in New York is, however, sparse, although two recent Second Department cases dealt with the issue in dicta. In *Ledogar v Giordano* (122 AD2d 834), in discussing the damages for pain and suffering which would be awarded to a child severely injured at birth, the court stated, "It is not necessary for the infant to be able to fully appreciate the consequences of his injury or to verbalize his pain" *(supra,* at 838, citing *Tinnerholm v Parke, Davis & Co.,* 411 F2d 48). The court further noted, "Also the jury may properly consider the effect that the plaintiff's injuries had on the normal pursuits and pleasures of life as part of the pain and suffering component of damages" *(supra,* at 838). In *Kavanaugh v Nussbaum* (129 AD2d 559), the court reemphasized the point: "In addition, we note that although there is no evidence that the infant plaintiff is capable of fully appreciating the consequences of his injuries, or that he is presently conscious of pain, an award for pain and suffering may be

---

and suffering, and whether, in the case of the former, cognitive awareness is a prerequisite to recovery. In declining to accept the questions, the court noted the pendency of the instant appeal and stated it did not wish to "affect the ordinary State procedure now in actual progress for the resolution of these issues" *(supra,* at 312). The court added that the preferable method to resolve the question would be to permit the normal process to run its course, and to have the benefit of "the considered deliberation and writing of our intermediate appellate court in a pending litigation" *(supra,* at 312).

based upon the effect that the injuries had upon the infant plaintiff's ability to enjoy the normal pursuits and pleasures of life" *(supra,* at 564, citing *Ledogar v Giordano, supra).*

There can be little doubt that loss of enjoyment of life may be measured in damages in New York as an element of pain and suffering. A host of cases have discussed the issue tangentially, usually in the context of defending awards for pain and suffering. *(See, e.g., Gallo v Supermarkets Gen. Corp.,* 112 AD2d 345, 347 ["this formerly healthy, athletic, social, confident and helpful young man has now become a virtual recluse, who can no longer lead a normal life"]; *Bottone v New York Tel. Co.,* 110 AD2d 922, 924 ["severe restrictions on past, present and future activities"]; *Alexander v Eldred,* 100 AD2d 666 [injury "prevents his participation in volleyball, tennis and skiing"]; *Sternemann v Langs,* 93 AD2d 819, 820 ["[a]s a result, the plaintiff has effectively lost much of the use of her right arm, has been deprived of a social life"]; *Rowan v County of Nassau,* 91 AD2d 608, 609 ["she is unable to participate in any of the sports and physical activities in which she was involved prior to the accident"]; *Neal v Rainbow House Fruits,* 87 AD2d 511 [injury "has significantly restricted her normal activities"]; *Warmsley v City of New York,* 89 AD2d 982, 984 ["plaintiff, who was very active prior to this occurrence, now feels she can do very little or nothing at all"]; *Riddle v Memorial Hosp.,* 43 AD2d 750, 751 ["It is also proper to consider, in the case at hand, impairment or loss of artistic pursuits" for which this housewife "did not receive financial remuneration" but which "was an important part of her life"].)

In one of the few instances where a State's highest court has spoken on the subject *(Flannery v United States,* 297 SE2d 433 [W Va]), loss of enjoyment of life was placed in the category of a separate element of damages, in the nature of a permanent injury. In considering the propriety of allowing an award for "the plaintiff's permanent disability resulting from his loss of capacity to enjoy life", the West Virginia Supreme Court of Appeals noted: "Just as a jury may consider the nature, effect and severity of pain when fixing damages for personal injury, or may consider mental anguish caused by scars and disfigurement, it may consider loss of enjoyment of life" *(supra,* at 438).

Other courts, without discussing its conceptual basis, have recognized loss of enjoyment of life as a separate and distinct claim. Some have noted that a separate award has the advan-

tage of facilitating judicial review as to the excessiveness of the total award. Those which have been wary in permitting loss of enjoyment of life to stand separate from pain and suffering have indicated a concern for the possible overlapping of awards. In interpreting Michigan law, the Sixth Circuit Court of Appeals noted, "The principal objection to the awarding of damages for loss of life's enjoyments is a fear of speculativeness and duplication." *(Pierce v New York Cent. R. R. Co.,* 409 F2d 1392, 1399, citing *McAlister v Carl,* 233 Md 446, 197 A2d 140.) The court determined that the District Court, sitting without a jury, had not committed reversible error in making a distinct award for loss of life's enjoyments, stressing that separate awards facilitated judicial review for excessiveness. In *Mariner v Marsden* (610 P2d 6), a Wyoming case, the trial court, sitting without a jury, had made separate awards for past and future pain and suffering, as well as for loss of enjoyment of life. The appellate court, stressing that it is the total award for general damages that is looked at for excessiveness, agreed that such loss was compensable, and held that the trial court could either make a separate award or take the loss of enjoyment of life into account in arriving at the total award for general damages *(supra,* at 12).

Eleven years after it decided *Pierce (supra),* the Sixth Circuit, stressing the conceptual distinction between the two elements of damage, again upheld a separate award for impairment of enjoyment of life in *Thompson v National R. R. Passenger Corp.* (621 F2d 814). In *Lebesco v Southeastern Pa. Transp. Auth.* (251 Pa Super 415, 380 A2d 848), the court held that because loss of such pleasures of life (inability to participate in the ordinary daily activities and recreational pursuits) is a separate compensable element of damages in a personal injury (but not wrongful death) action, the trial court correctly instructed the jury regarding plaintiff's ability to recover damages for loss of enjoyment of life. *(See also, Robert v Chodoff,* 259 Pa Super 332, 393 A2d 853.)

The confusion between pain and suffering and loss of enjoyment of life has prompted one commentator to note: "Despite the distinctions between pain and suffering and loss of enjoyment of life, the two concepts are often equated with one another. This result is derivative of at least two factors; the intangible nature of each concept, and the similar circumstances under which both types of damages may arise." (Comment, *Loss of Enjoyment of Life as a Separate Element of Damages,* 12 Pac LJ 965, 973 [1981].)

■ Clearly, as amorphous as the concepts may be, pain and suffering and loss of life's enjoyment are nevertheless distinguishable from one another. The award of damages for pain and suffering compensates the victim for physical discomfort and anguish, while loss of enjoyment, as the Pacific Law Journal article observed, concerns "the impairment of one's capacity to enjoy life." *(Id.,* at 972.) While perhaps pain and suffering is somewhat more tangible an element of damage and thus easier to recompense than loss of enjoyment, both are measurable, as well as distinguishable from each other.

In a leading text on the subject (Minzer, Damages in Tort Law) it has been noted: "The injuries are not unrelated, and often are discussed as though they are synonymous or closely associated with items of damages in personal injury litigation. A number of jurisdictions treat loss of enjoyment as an element to be assessed in arriving at an award for pain and suffering. This approach can blur the distinctions which should guide careful analysis." *(Id.,* § 8.10, at 8-13.) Minzer further notes: "Basically, the problem is nothing more than one of definition. As with any other item of damage, the elements unique to a loss of enjoyment claim should be carefully identified. In jurisdictions which permit a separate award for loss of enjoyment, the injury so claimed should be distinguished in its crucial respects from those falling within the separate category of pain and suffering." *(Id.,* at 8-15.)

In Personal Injury Actions: Defenses and Damages (vol 3, § 3.04 [5], at 296), Messrs. Frumer and Friedman write: "The possible overlapping between an enjoyment or inability to lead a normal life claim and a pain and suffering claim is considerable. Some jurisdictions treat these items of damages separately while a number of jurisdictions treat loss of enjoyment as an element considered in arriving at an award for pain and suffering. In either case the elements unique to a loss of enjoyment, the damage claimed, must be distinguished in its unique respects from the separate category of pain and suffering." The authors also note: "The difficult issue arising from loss of enjoyment claims is whether the injuries compensable via the element of loss of enjoyment of life are distinguishable from other compensable elements of injury. The majority rule is in the affirmative." *(Id.,* at 301.)

Thus, as these commentaries indicate, loss of enjoyment of life is conceptually different from pain and suffering. Furthermore, as those courts which have sanctioned their use point

out, separate awards have the utility of facilitating appellate review as to the excessiveness of the total damage award. *(See, e.g., Behar v Hospital of Albert Einstein Coll. of Medicine,* 95 AD2d 728; *also, Merrill v Albany Med. Center Hosp.,* 126 AD2d 66.)*

Of course, the real issue in a case involving a comatose patient is whether recovery may be had for loss of enjoyment of life absent cognitive awareness. The defendants, citing *Flannery v United States* (718 F2d 108, *cert denied* 467 US 1226), argue that loss of enjoyment is an inseparable component of pain and suffering and therefore not compensable absent a conscious awareness on the plaintiff's part of his/her condition. In *Flannery,* the Court of Appeals for the Fourth Circuit expressly rejected separate awards for both the permanency of plaintiff's injuries as an element of pain and suffering and loss of the enjoyment of life as an "impermissible" duplication of damages *(supra,* 718 F2d, at 111). The District Court had awarded damages to a comatose patient for an impaired capacity to enjoy life, finding loss of enjoyment to be a separate element of damages under applicable West Virginia law. On appeal, the Fourth Circuit initially certified the question of State law to the West Virginia Supreme Court of Appeals (649 F2d 270), which found that loss of enjoyment of life damages were properly allowed in the case of a semicomatose plaintiff who, because of the severity of his injuries, was not aware of such loss. *(Flannery v United States, supra,* 297 SE2d, at 438.) Notwithstanding, the Fourth Circuit then refused to allow the loss of enjoyment award, on the grounds, *inter alia,* that it was proscribed by the Federal Tort Claims Act. *(Flannery v United States, supra,* 718 F2d, at 111.)

The precedential value of the Fourth Circuit's holding in *Flannery (supra)* has been seriously undercut, however, by a recent decision of the Court of Appeals for the Second Circuit in *Rufino v United States* (829 F2d 354), which, after our Court of Appeals refused to accept certification of two questions involving the right of recovery in a loss of enjoyment of life case (69 NY2d 310), and based primarily on the "well-reasoned opinion" of the Trial Justice in this case (132 Misc 2d 457, 460, *supra* [Gammerman, J.]), allowed a comatose plaintiff without any cognitive awareness to recover for loss of enjoyment of life. In so ruling, the court predicted that "in this evolving area of the law, New York will in due course

recognize loss of enjoyment of life as a separately compensable item of damages" *(supra,* at 362).

The Ninth Circuit Court of Appeals in *Shaw v United States* (741 F2d 1202) has also rejected the *Flannery* analysis that a loss of enjoyment recovery is barred absent cognitive awareness. Finally, as already noted, in *Kavanaugh v Nussbaum* (129 AD2d 559, *supra),* the Second Department allowed an infant, brain damaged at birth, to recover, as part of an award for pain and suffering, damages for the effect his injuries had on his ability to enjoy the normal pursuits and pleasures of life, despite the lack of evidence that he could appreciate the consequences of his injuries.

Several English cases, which appear to be precisely on point, have also adopted an objective standard, that is, that the victim's ignorance of his/her loss is irrelevant, in determining the viability of a loss of life's enjoyment claim. In *Wise v Kaye* ([1962] 1 QB 638, [1962] 1 All ER 257), the plaintiff, a passenger injured in an automobile collision, had remained unconscious from the time of the accident 3½ years earlier to the time of trial. By reason of the deep and extensive brain injury she had sustained, she could not see, talk or hear and was deprived of every faculty, except the ability to breathe and digest enough sustenance to survive. The Trial Judge had awarded her a sum for loss of enjoyment of life, known as "loss of amenities". Rejecting many of the same arguments as are made here, namely, that the plaintiff was incapable of personally enjoying such an award, which would not likely be used to maintain her, but ultimately pass to her next of kin, the court disposed of the lack of awareness argument as follows: "I am not apprised of any branch of our law which permits a person who is known or believed to be alive to be treated as if he or she were dead * * * [A]s long as the plaintiff lives, her damages, in my view, fall to be considered as damages to be awarded to a living person and no living person could have lost more of the use of limbs and faculties" *(supra,* [1962] 1 QB, at 654, [1962] 1 All ER, at 265).

In *West & Son v Shephard* ([1963] 2 All ER 625), the House of Lords, in considering the claim of a patient who, not unlike plaintiff herein, was conscious "to a slight degree", made the following observation: "The fact of unconsciousness is therefore relevant in respect of, and will eliminate, those heads or elements of damage which can only exist by being felt or thought or experienced. The fact of unconsciousness does not, however, eliminate the actuality of the deprivations of the

ordinary experiences and amenities of life which may be the inevitable result of some physical injury" *(supra,* at 633).

We conclude that there is a conceptual difference between pain and suffering and loss of enjoyment of life, and that the latter is a separate element of damage to which cognitive awareness or the ability to spend the award of damages is irrelevant. A loss of enjoyment of life claim should, therefore, consonant with the purpose and spirit of CPLR 4111 (d), which requires an itemization of malpractice awards, be submitted as a separate element of damages, even though it is not explicitly listed therein as an element, while pain and suffering is. It should be noted that the section's listing of damages elements is expressly stated to be noninclusive. Moreover, in this case, the separate submission of the loss of enjoyment claim has the advantage of facilitating appellate review of the issue of excessiveness of damages and segregating the claim, which does not require a showing of cognitive awareness, from conscious pain and suffering, which does.

■ Several other issues remain for consideration. The defendants (except New York Infirmary) argue that the trial court improperly permitted Dr. Kaplan to testify on the basis of a supplemental physical examination report which was produced for the first time on the eve of trial. Section 202.17 (g) of the Uniform Rules for Trial Courts (22 NYCRR) provides that a party "shall, within 30 days after the discovery thereof, and not later than 30 days before trial, serve upon all parties a supplemental medical report". Section 202.17 (h), however, permits a court to dispense with this requirement "in the interests of justice and upon a showing of good cause". The defendants argue that plaintiff failed to offer an appropriate excuse for the delay in serving Dr. Kaplan's report to justify a waiver of the rule's requirements. We reject this argument. The "interest of justice and good cause" requirement is concerned less with the excuse offered for the failure timely to serve the report than it is with a party's need for the medical proof, the availability of alternate sources and the adverse party's preparedness to cross-examine with respect to the evidence based on the newly furnished report. *(See, Rivera v City of New York,* 107 AD2d 331, 335.) Here, the defendants' claim of surprise is considerably weakened by the hospital records, which are replete with nurses' notes as to the patient's responsiveness. While plaintiff may have been technically in violation of the rule, the defendants had almost three weeks after the receipt of the report to prepare for Dr.

Kaplan's cross-examination. They are unable to point to any prejudice due to the delay.

In the only point on appeal attacking the liability verdict, Dr. Garber, whose liability was apportioned at 15%, argues that, as to her, plaintiff was allowed to establish two additional theories of malpractice not within the ambit of the bill of particulars, namely, the performance of the tubal ligation and the performance of the Caesarean section under general anesthesia. The bill of particulars, which specified in detail the manner in which she was alleged to have been negligent, also contained the broad language that she was "otherwise careless and negligent in failing to treat the patient skillfully and properly".

At trial, over objection, the court permitted plaintiff to offer proof that Dr. Garber was negligent in failing to cancel the operation after being informed by another doctor that the patient had a preference for regional anesthesia; in failing to call for assistance earlier; in failing to institute cardiac massage as soon as complications arose; and in proceeding at that juncture to perform the tubal ligation. The court justified taking such evidence on the basis of the general language in the bill of particulars that Dr. Garber "had been otherwise negligent". Dr. Garber was held liable on the first three theories and, based upon a finding of lack of proximate cause, exonerated of any liability as to the tubal ligation.

Dr. Garber argues that the purpose of a bill of particulars is to amplify a pleading, define the issues and limit the proof (*Nelson v New York Univ. Med. Center.,* 51 AD2d 352), and that the general language in plaintiff's bill, upon which the court relied, violated that purpose and should have been stricken. Recognizing that she failed to move for such relief, either within 10 days after receipt of the bill as required by CPLR 3042 (d) or at any time prior to trial, and, citing *City of New York v Friedberg & Assocs.* (62 AD2d 407), Dr. Garber argues that the time limit is inapplicable in a case such as this where the language is so "palpably improper".

■ While Dr. Garber's claim may have legal merit in the abstract, a showing sufficient to warrant a new trial on liability has not been made. Of the four theories submitted to the jury of which Dr. Garber complains, none were barred by the statement in the bill of particulars that other than as specifically alleged plaintiff was not alleging that any procedure was per se contraindicated. Moreover, the specific claims

in the bill of particulars regarding the intubation of the patient, and failure to monitor and observe the patient properly and to treat signs of hypoxia and cardiac arrest earlier appear collectively to cover the various theories of liability. Indeed, Dr. Garber ultimately complains only about the submission of her alleged negligence in failing to cancel the operation after being advised that the patient had a preference for regional anesthesia and in proceeding to perform the tubal ligation in light of the patient's complications. As already noted, however, Dr. Garber was found not liable on the latter theory and the former theory was covered by the bill of particulars' claim of negligent intubation. Moreover, Dr. Garber was also found liable on two other separate theories.

■ We have examined the defendant's other contentions, all of which concern excessiveness, and find them without merit. As to the only surviving aspect of the cross appeal, we find that the trial court properly struck the $2,353,374 award for future nursing care. Even plaintiff concedes that a recovery for future medical expenses should be limited to those which are necessary and reasonably certain to be incurred. Plaintiff failed to meet that standard since Dr. Kaplan conceded that round-the-clock nursing care was not required. Indeed, on this record, it is unclear as to what function such nursing would serve or how it would assist plaintiff's condition.

Accordingly, the judgment of the Supreme Court, New York County (Ira Gammerman, J.), entered August 8, 1986, should be affirmed, without costs or disbursements. The appeal from the order of the same court and Justice, entered July 11, 1986, should be dismissed, without costs or disbursements, as subsumed in the appeal from the judgment.

KUPFERMAN, J. P., CARRO, MILONAS and ROSENBERGER, JJ., concur.

Judgment, Supreme Court, New York County, entered on August 8, 1986, unanimously affirmed, without costs and without disbursements, and the appeal from the order of said court and Justice entered on July 11, 1986 is unanimously dismissed, as having been subsumed in the appeal from the aforesaid judgment, without costs and without disbursements.