Linda Nussbaum, as Executrix of Elaine Celetti, Deceased, Respondent, v Alan Gibstein et al., Appellants.

Second Department, July 5, 1988

## APPEARANCES OF COUNSEL

*LeBoeuf, Lamb, Leiby & MacRae (Michael A. Ellenberg, Ellen August* and *Bert H. Ware* of counsel), for appellants.

*Kramer, Dillof, Tessel, Duffy & Moore (Norman E. Frowley* of counsel), for respondent.

## OPINION OF THE COURT

THOMPSON, J. P.

We address on this appeal, *inter alia,* whether loss of enjoyment of life is a compensable element of damages apart from a specific award of damages for pain and suffering. The trial court's instructions to the jury and its submission of interrogatories permitted the jury to assess the loss of enjoyment of life as a distinct item of damages. Upon the facts of this particular case, we find that the trial court did not err in

delivering a loss of enjoyment of life instruction in addition to the usual instruction pertaining to pain and suffering. The question of whether an award of damages for loss of the normal pursuits and pleasures of life is encompassed within general damages for pain and suffering or constitutes a separate category of damages is essentially semantical because a clear distinction may be drawn between the concepts of pain and suffering and loss of enjoyment of life. Permitting an independent award for loss of enjoyment simply enunciates this court's recognition of the conceptual differences between these two types of damages. We therefore affirm the judgment in favor of the plaintiff in its entirety.

I

The following facts giving rise to this controversy are essentially not in dispute. On September 21, 1982, the plaintiff's decedent, 32-year-old Elaine Celetti, visited her gynecologist, the defendant Dr. Alan Gibstein, for her annual checkup. At that time, Dr. Gibstein made note of a one-centimeter mass on the outside lower quadrant of Mrs. Celetti's left breast which he tentatively classified as a galactocele, i.e., a milk-filled cyst. No further tests were performed. Ten months later in July 1983 Mrs. Celetti returned to Dr. Gibstein complaining of a painful lump in her left breast and a swelling under her left arm. Following a mammography and other examinations, the mass in Mrs. Celetti's breast was diagnosed as cancer which had metastasized, i.e., spread, to three ribs and two vertebrae. Elaine Celetti died nearly two years later on June 8, 1985, as a result of the extensive metastasis of the cancer leaving as the sole distributee of her estate her then four-year-old daughter Jessica.

In this action commenced to recover damages for conscious pain and suffering and wrongful death, Dr. Gibstein and his professional corporation are charged with various acts of malpractice stemming from his failure to properly diagnose Mrs. Celetti's breast cancer and to provide appropriate medical care and treatment. The jury, after finding the defendants 90% liable and the plaintiff's decedent 10% contributorily negligent, rendered the following itemized award of damages, in accordance with the court's instructions and special interrogatories:

A.  First Cause of Action:
    1.  Conscious Pain and Suffering        $300,000
    2.  Loss of Enjoyment of Life           $200,000
                                            $500,000

B.  Wrongful Death Cause of Action:
    1.  Loss of Support                     $ 75,000
    2.  Loss of Household Services          $100,000
    3.  Cost of College Education
        in the future                       $ 25,000
    4.  Loss of Prospective Inheritance     $ 75,000
    5.  Loss of Parental Guidance,
        Care and Nurture                    $100,000
                                            $375,000.

The defendants immediately moved to set aside the verdict on the grounds, *inter alia,* that as to liability the verdict was against the weight of the evidence and inconsistent. The defendants further charged that the damages awarded were excessive, the damages for loss of enjoyment of life were duplicative of the damages awarded for pain and suffering, the amount awarded for prospective loss of inheritance was speculative, and the award of damages for college costs was also speculative as well as duplicative of the recovery for loss of support. The trial court denied the motion and, thereafter, entered judgment for the amounts awarded by the jury reduced by the 10% of the fault attributable to the plaintiff's decedent. The reductions made as to the total amounts awarded on each cause of action are reflected in the judgment as follows:

First Cause of Action                   $450,000
Wrongful Death Cause of Action          $337,500
                                        $787,500.

The amount of the judgment with interest, costs and disbursements totaled $845,772.59.

The defendants appeal, arguing that (1) the verdict as to liability is against the weight of the credible evidence adduced at the trial, (2) the awards of separate amounts of damages for pain and suffering and impairment of the ability to enjoy life are duplicative, and (3) the awards to Mrs. Celetti's child on the wrongful death cause of action for loss of prospective inheritance and cost of a college education are speculative.

## II

We affirm the trial court's denial of the defendants'

motion to set aside the verdict in favor of the plaintiff as against the weight of the evidence. As the courts have frequently stated, a verdict will be set aside on this basis only if the jury determination could not have been reached on any fair interpretation of the evidence (see, Nicastro v Park, 113 AD2d 129, 134). On such a review, the evidence must be viewed in a light most favorable to the plaintiff to determine whether a sufficient rational basis exists to support the jury's finding of liability as to the defendant (see, Cohen v Hallmark Cards, 45 NY2d 493, 497). So viewed, we find ample basis in the record to support the jury's verdict.

One of the key issues in controversy at trial was whether the lump Dr. Gibstein first noticed in Elaine Celetti's breast in September 1982 was the same as the cancerous tumor surgically removed from the decedent's breast one year later. Dr. Gibstein, a specialist in obstetrics and gynecology who had also completed a fellowship in oncology, first noted the lump measuring one centimeter in size in Mrs. Celetti's breast during a routine physical examination performed in September 1982. Apparently because of the decedent's history of being cystic, Dr. Gibstein was not overly concerned about the lump upon its initial appearance. According to Dr. Gibstein's trial testimony, after making a tentative determination that the lump was a one-centimeter galactocele and making a diagram indicating the location of the lump, Dr. Gibstein advised Mrs. Celetti to return for a follow-up examination in 2 or 3 months. Dr. Gibstein conducted no further procedures to either confirm his diagnosis or to rule out the possibility of carcinoma. Nor did he advise the decedent to examine her breasts during the intervening period. Dr. Gibstein's office records confirm that he had doubts with respect to his diagnosis since next to the word galactocele and next to the diagram on which he indicated the location of the lump he placed a question mark. The records further corroborated his instructions to Mrs. Celetti.

Upon the decedent's return to his office 10 months later in July 1983 Dr. Gibstein examined the lump of which the decedent then complained and was of the opinion that while it was near the site of the September 1982 lump, the respective masses were in fact in entirely different locations. Dr. Gibstein, fearing the lump might be cancerous, directed Mrs. Celetti to return for a reexamination following her next menstrual period. In August 1983 Dr. Gibstein recommended that the decedent undergo a mammography and, based upon

those results, he referred her to Dr. Louis Lester for a surgical consultation. Dr. Gibstein learned from Dr. Lester that the decedent had been diagnosed as having intraductal, infiltrating duct carcinoma with a finding of distant metastasis. A stage four cancer[1] of the type Mrs. Celetti was diagnosed as having in September 1983 had an extremely poor prognosis. In response to a hypothetical posed by plaintiff's counsel, Dr. Gibstein conceded that if the lump found in September 1982 was cancerous, it would have been a stage one cancer with an excellent rate of survival.

In the course of Mrs. Celetti's examination before trial, conducted prior to her death and read into the trial record in pertinent part, she testified that Dr. Gibstein had found her to be in good health at the time of her checkup in September 1982 and told her to return in a year. Discovery of a painful lump and swelling under her left arm prompted the decedent to return to Dr. Gibstein in July 1983. During that examination, Mrs. Celetti saw a diagram in her file with an "X" where the lump was. To her surprise, Dr. Gibstein had been aware of the lump, identified it as a cyst and reassured her that he was "watching it". No recommendation was issued that a mammography be performed or another physician be consulted. Dr. Gibstein simply prescribed vitamins and instructed her to return after her next period. Only later when she consulted Dr. Lester upon the defendant's recommendation did Mrs. Celetti learn the gravity of her condition. Dr. Lester was able to confirm the presence of cancer after only a brief examination because the skin in the area of the lump had a dimpling effect resembling the skin of an orange when it was palpated in a certain manner. Owing to the advanced nature of the cancer, a lumpectomy rather than a mastectomy was later performed. Following surgery, the decedent was placed on a regimen of hormonal therapy and later chemotherapy.

Testimony was elicited from the plaintiff's expert Dr. Mi-

---

1. The plaintiff's expert testified that staging classifies cancers according to how susceptible they are to treatment. The higher the stage the less treatable the cancer. Stage one is identified as involving a primary tumor of less than two centimeters, where no regional lymph nodes are affected and where there is no evidence of metastasis to distant organs. Stage two involves a tumor of less than five centimeters which shows some evidence of regional lymph node metastasis but where there is no evidence of metastasis to any distant organs. Stage three involves a lesion greater than five centimeters in size but which shows no evidence of spread to distant organs. Stage four is a cancer which has metastasized to distant parts of the body such as liver, lungs or bones.

chael Scoppetuolo, a specialist in internal medicine and oncology and her subsequent treating physician, that the one-centimeter breast lesion palpated by Dr. Gibstein in September 1982 was the same as the 2.5-centimeter tumor which was removed in September 1983 since the tumor was in the exact same spot as the lesion. In his professional opinion, the mass found in September 1982 was a stage one cancer with an 80% cure rate. Dr. Scoppetuolo testified that Dr. Gibstein's care and treatment of the decedent constituted a departure from good practice and acceptable medical standards in the community based upon (1) his failure to follow up his September 1982 examination of the decedent by timely reexamination after her next menstrual cycle or to order a mammogram upon discovery of the one-centimeter mass, and (2) his failure to tell the decedent in September 1982 of the existence of the lump and to instruct her to examine herself.

The defendants' expert evidence consisting of the testimony of Dr. Harold Schulman, a specialist in obstetrics and gynecology, and Dr. William Ober, a pathologist, was presented to refute the allegations of malpractice. The defendants' experts were consistent in their opinion that although the lesion which was palpated in September 1982 was in the same location as the tumor removed in September 1983 the former did not lead to the latter. The basis for this opinion was the theory of "doubling times" which refers to the growth rate of tumors. According to the "doubling times" concept of oncology, a tumerous mass hypothetically doubles in size every 60 days. If this theory were followed in its strictest sense the decedent's September 1983 tumor would not have been palpable in September 1982. However, the defendants' experts agreed that studies measuring the growth rate in the human breast as opposed to the laboratory have shown doubling times ranging from 20 to 209 days. Dr. Schulman also conceded that the failure to take any measures following the discovery of a lesion in Mrs. Celetti's breast in September 1982 would have been a departure from accepted medical practice. His opinion that Dr. Gibstein had acted in accordance with accepted medical standards in the community stemmed from his rejection of the decedent's statements that Dr. Gibstein did not tell her about the lump.

With due deference to the jury's determination based upon its opportunity to observe and hear the witnesses, and weighing the conflicting testimony of the parties and their respective experts, we cannot say that the evidence so preponder-

ated in favor of the defendants that the jury could not have reached their conclusion upon any fair interpretation of the evidence *(see, Cohen v Hallmark Cards, supra; Nicastro v Park, supra,* at 134-135). Viewing the entire body of evidence, it was entirely plausible for the jury to conclude that the lesion noted in the decedent's medical record in 1982 developed into the malignant tumor removed in 1983 and to find that Dr. Gibstein was negligent in failing to order tests or to follow up his initial examination to check the condition of the lump. The total verdict reflected a thoughtful evaluation of the evidence and not merely a determination, as the defendants suggest on this appeal, which reflected an overriding sympathy for the decedent's infant daughter. Therefore, the verdict as to liability must stand.

## III

## A

The defendants' remaining arguments relate to the calculation of damages. Principally, in this regard, the defendants assign error to the trial court's instructions to the jury that the plaintiff was entitled to compensation for the loss of enjoyment of life as a distinct item of damages. The defendants urge that that submission to the jury compelled an award of double compensation in contravention of CPLR 4111 (d). The court charged the jury with respect to damages for pain and suffering and loss of enjoyment of life, in part, as follows:

"With respect to the cause of action for the pain and suffering, physical and emotional allegedly undergone by Miss *[sic]* Celetti for the year and nine months immediately preceding her death from September of '83 to June 8, 1985 when she died, her estate is entitled to recover for all of the conscious pain, physical pain and suffering and disability Miss *[sic]* Celetti underwent during said one year and nine months as a result of the defendants' negligence. Her estate is entitled to recover damages for any mental suffering, including emotional disturbances undergone by her during the one year and nine months as a result of the defendants' negligence.

"Additionally, her estate is entitled to recover for any loss of the normal pursuits of pleasures of daily life attributable to defendants' negligence during that one year and nine month period. The normal pursuit and pleasures of life encompass all those things that make up life's pleasure.

"Any award for the loss of the normal pursuits and pleasures of life is to be separate and distinct from an award for any conscious pursuit *[sic]* of suffering and death result[. With] respect to the action of the wrongful death, the measure of damage is fixed by statute".

The issue of damages was also submitted to the jury on carefully framed interrogatories which, *inter alia,* instructed the jury to state separately its award compensating the decedent for "conscious physical and emotional pain and suffering" and for "loss of the enjoyment of the pursuits and pleasures of life". The jury awarded the plaintiff damages in the sum of $300,000 for conscious pain and suffering and $200,000 for loss of enjoyment of life which the Trial Judge reduced by the 10% of the fault attributable to the plaintiff's decedent for a total award as to these items of $450,000.

At the outset, we note that the defendants make no argument as to the excessiveness of damages for the pain endured by the decedent until her death. The evidence adduced at trial demonstrated overwhelmingly that the decedent endured intense physical and emotional suffering directly stemming from the cancer and the treatments she received. Nor can there be any doubt that prior to her death Mrs. Celetti lost her capacity to enjoy the normal pursuits and pleasures of life.

At the time her condition was first diagnosed, Mrs. Celetti, then a 32-year-old mother of a young child, was in the process of obtaining a divorce from her husband who contributed nothing toward her own or her child's support. Although after the birth of her daughter Jessica the decedent had discontinued working outside the home, she was certified as a teacher for kindergarten through twelfth grade and had been a permanent substitute teacher in the Lawrence School District for 1½ years prior to Jessica's birth. She held undergraduate degrees in art education and psychology and was working toward obtaining an advanced degree in psychology in preparation for a child psychology program. Mrs. Celetti had always been a very self-sufficient and independent person. She had fully participated in the daily activities of her child including frequent outings with other children to the zoo, the park, the beach and other entertainment and recreational activities. Because of her rapidly deteriorating physical condition and the negative effects of the medical treatment, the decedent's life changed to a tragically radical degree. Mrs. Celetti initially underwent two months of hormone therapy which was

discontinued when she stopped responding. Mrs. Celetti began experiencing excruciating pain in her right leg which was determined to be caused by an additional lesion. She was then placed on a program of pain killers including morphine and methadone which her treating physician testified only dulled the recognition of pain in the brain but did not eliminate the pain. She also received a combination of five chemotherapy drugs which caused debilitating side effects. Mrs. Celetti became constipated, weak and tired, suffered from insomnia and began losing weight at the rate of 2 or 3 pounds per week. Her bones became very brittle and she was warned by her physicians to be very careful to avoid breaking them. In fact, Mrs. Celetti had to be hospitalized on three separate occasions for hypocalcemia which is an elevation of calcium in the blood causing sleeplessness, lethargy, confusion, difficulty in walking, severe dehydration and ultimately death. The continuous vomiting caused by the chemotherapy resulted in dental infections and the loss of six teeth which Mrs. Celetti had to have extracted with only a minimal amount of novocaine due to the chemotherapy.

The decedent became a virtual invalid. She relied on a homemaker, her friends and family to care for her child, to shop for her, to clean her house, to prepare meals and to drive her to the hospital. She had no physical strength. She was too weak to pick up her daughter or to perform any type of housework. Moreover, because of her weakened bones the decedent was afraid to go to any crowded places such as a train station or shopping mall for fear of being hit in her ribs or vertebrae. In any event, she was physically unable to shop for herself. Her social life became nonexistent.

Perhaps the more difficult pain for Mrs. Celetti was the emotional and psychological pain she suffered as a result of the loss of control over her life, the changed attitudes toward her of her family and friends and the strain of her illness on her relationship with her daughter. Her daughter was greatly affected by her illness and had difficulty understanding why her mother could no longer participate in activities with her. While the decedent arranged for Jessica to be raised by her brother and sister-in-law who have three sons, she was saddened that she could bear no other children to provide brothers and sisters for Jessica.

■ In view of the decedent's extensive losses and suffering, the aggregate award on the first cause of action was well within the bounds of reason. The question remains whether,

notwithstanding the reasonableness of the award, the trial court correctly included in its instructions on damages a separate instruction on loss of enjoyment of life. We are of the opinion that the trial court's instructions to the jury were entirely proper.

Initially, we observe that several decisions issuing from this judicial department have recognized the loss of the normal pursuits and pleasures of life as a proper component in assessing general damages for pain and suffering *(see, e.g., Kavanaugh v Nussbaum,* 129 AD2d 559, 564, *mod on other grounds* 71 NY2d 535; *Ledogar v Giordano,* 122 AD2d 834, 838, *appeal withdrawn* 68 NY2d 911; *Gallo v Supermarkets Gen. Corp.,* 112 AD2d 345, *lv denied* 66 NY2d 605). Review of those decisions indicates that the question of whether a separate award for loss of enjoyment of life is permissible was not presented to or addressed by the court and the award for loss of enjoyment was simply collateral to the question of whether the award for pain and suffering constituted fair compensation for the injuries suffered. Consistent with the determinations of this judicial department is the interpretation of New York law (28 USC § 1346 [b]) by the United States Court of Appeals for the Second Circuit which similarly upheld as proper the consideration of loss of enjoyment of life as a factor in determining general damages *(see, Modave v Long Is. Jewish Med. Center,* 501 F2d 1065, 1079; *Lebrecht v Bethlehem Steel Corp.,* 402 F2d 585, 592; *Grunenthal v Long Is. R. R. Co.,* 388 F2d 480, 484, *revd on other grounds* 393 US 156).

The current debate reduces to a question of whether this court should remain bound by the characterization of the impairment of capacity to enjoy life as primarily an element of pain and suffering or should permit an explicit independent recovery therefor.

Of the courts in our sister States that have considered the issue, a majority continue to allow for consideration of loss of enjoyment only as one of the factors in assessing general damages for pain and suffering *(see generally,* Annotation, *Damages Element-Loss of Enjoyment of Life,* 34 ALR4th 293, 300-304; Comment, *Loss of Enjoyment of Life as a Separate Element of Damages,* 12 Pac LJ 965, 967 [1981]). One of the major arguments advanced against allowing an independent recovery for loss of enjoyment of life is that it would encourage excessive damage awards and result in double compensation for the plaintiff, particularly in jury trials *(see, e.g., Huff v Tracy,* 57 Cal App 3d 939, 944, 129 Cal Rptr 551, 553; *Poyzer v*

*McGraw,* 360 NW2d 748, 752-753 [Iowa]; *Santa Rosa Med. Center v Robinson,* 560 SW2d 751, 760-762 [Tex Civ App]; *see also,* Comment, *Loss of Enjoyment of Life—Should it be a Compensable Element of Personal Injury Damages?,* 11 Wake Forest L Rev 459, 466 [1975]).

The sole appellate authority in New York which squarely addresses this issue is the recent decision of our colleagues in the Appellate Division, First Department, in the case of *McDougald v Garber* (135 AD2d 80, *lv granted* 138 AD2d 268). *McDougald* involved a 31-year-old comatose woman on whose behalf a medical malpractice action was commenced to recover compensation for the severe and permanent neurological injury which she sustained during the course of a Cesarean section negligently performed by the defendant doctors. At trial, the parties sharply disputed the extent of the plaintiff's ability to appreciate her condition and experience pain. Because of the conflicting proof relating to the plaintiff's level of consciousness, the trial court instructed the jury to consider the loss of enjoyment of life separately from pain and suffering. On the appeal, the defendants sought the elimination of the jury award for loss of enjoyment of life. The defendants argued that the loss of enjoyment was inseparable from pain and suffering. Hence, since pain and suffering was not compensable absent a conscious awareness, neither could a recovery for loss of enjoyment be obtained under like circumstances. The First Department rejected the defendants' argument, finding instead that a marked conceptual difference existed between pain and suffering and loss of enjoyment of life which permitted their submission to the jury as separate components of damages. In concluding its discussion of this issue, the court stated: "A loss of enjoyment of life claim should, therefore, consonant with the purpose and spirit of CPLR 4111 (d), which requires an itemization of malpractice awards, be submitted as a separate element of damages, even though it is not explicitly listed therein as an element, while pain and suffering is. It should be noted that the section's listing of damage elements is expressly stated to be noninclusive. Moreover, in this case, the separate submission of the loss of enjoyment claim has the advantage of facilitating appellate review of the issue of excessiveness of damages and segregating the claim, which does not require a showing of cognitive awareness, from conscious pain and suffering, which does" *(McDougald v Garber, supra,* at 94).

In arriving at this determination, the First Department's decision appears to hinge on the underlying purpose of tort damages, i.e., to compensate for each injury suffered so as to make the injured party whole *(McDougald v Garber,* 132 Misc 2d 457, 462, *affd* 135 AD2d 80, *lv granted* 138 AD2d 268, *supra).*

The decision of the United States Court of Appeals for the Second Circuit in *Rufino v United States* (829 F2d 354) turned upon its assessment of the opinion of the Supreme Court, New York County, in *McDougald (supra)* and its prediction that the appellate courts in New York would adopt the trial court's reasoning that loss of enjoyment of life was a separately compensable item of damages irrespective of the injured plaintiff's cognitive awareness.[2] Like *McDougald,* the plaintiff in *Rufino* had no conscious awareness of his condition. He was in a chronic vegetative state as the result of the defendant's negligence in monitoring his condition following cardiac surgery which led to his being deprived of oxygen and suffering massive brain damage. The trial court awarded minimal damages for pain and suffering based upon evidence of the plaintiff's limited conscious pain and suffering. However, because of his lack of cognitive awareness and, by extension, his ability to appreciate the pursuits and pleasures of life and the resulting loss, the trial court refused to consider the issue of loss of enjoyment of life with respect to the plaintiff's damages. The Second Circuit made no definitive ruling of whether loss of enjoyment should be separately compensable because questions of damages in Federal cases are required to be resolved according to New York law. The absence of appellate decisions on this issue deprived the Second Circuit of State judicial precedent upon which to resolve the matter. Nevertheless, the matter was remitted to the District Court because it had failed to consider loss of enjoyment of life as either a

---

2. The Court of Appeals in *Rufino v United States* (829 F2d 354) had certified to the New York Court of Appeals two questions of law involving whether under New York law the loss of enjoyment of life was separately compensable and whether cognitive awareness was a prerequisite to recovery therefor. This State's highest court declined to accept certification on the ground that the very questions certified were the subject of an appeal to the Appellate Division, First Department, in *McDougald v Garber* (135 AD2d 80, *lv granted* 138 AD2d 268). The Court of Appeals stated its preference to allow those issues to be resolved in the course of the usual appellate process in a pending litigation rather than upon certification of questions from the Federal court *(see, Rufino v United States,* 69 NY2d 310).

separate item of damages or as a factor in determining pain and suffering.[3]

The rule of *McDougald* and *Rufino (supra)* appears to be predicated on the distinction between the concepts of pain and suffering and loss of enjoyment of life. One commentator, in urging that loss of enjoyment be separately compensable, described at length the characteristics distinguishing each item of damages (Comment, *Loss of Enjoyment of Life as a Separate Element of Damages,* 12 Pac LJ 965, 969-973 [1981]). For the sake of brevity that discussion may be condensed to the characterization of pain as the physiological response to the corporeal injury while suffering refers to the emotional or psychological reaction to these sensations. Loss of enjoyment of life, however, involves the impairment of a person's ability to perform those functions or engage in activities which were part of one's life prior to the injury-causing event. The commentator went on to note that because of the distinguishing features of each, the type of proof relative to each would be different. Loss of enjoyment would require evidence of the nature and extent of the injured plaintiff's life-style prior to being injured and the limitations on his or her enjoyment of the pursuits and pleasures of life following the injury. In contrast, proof of pain and suffering would require production of evidence of a corporeal injury and the accompanying physical sensations and emotional response (Comment, *Loss of Enjoyment of Life as a Separate Element of Damages,* 12 Pac LJ 965, 978-979 [1981]).

Because of what were deemed to be the unique characteristics of each element of damages, the First Department in *McDougald (supra)* found that carefully drafted instructions requiring the jury to award separate monetary amounts for each component of damages would facilitate the appellate process by providing a better framework for reviewing the award and determining whether it is excessive. It would

---

**3.** *Flannery v United States* (297 SE2d 433 [W Va]) held that under West Virginia law loss of enjoyment of life was an independently compensable injury. In spite of the West Virginia Supreme Court of Appeals interpretation of West Virginia law, the United States Court of Appeals for the Fourth Circuit disallowed an award of damages for loss of enjoyment of life on the basis that such an award to a semicomatose patient violated the Federal law proscription against awarding punitive damages against the United States (28 USC § 2674). Both the Second and Ninth Circuits have rejected the *Flannery* analysis and, hence, its precedential value is subject to question *(Rufino v United States,* 829 F2d 354, 362; *Shaw v United States,* 741 F2d 1202, 1208-1209).

further remove an element of speculation from the appellate process, enhancing both the court's understanding of the various elements of the damages awarded as well as the litigants' assessment of whether to appeal the damage award.

Noteworthy in this regard is the fact that even the courts that initially were inclined to permit independent assessment of damages for loss of enjoyment of life were reluctant to permit juries to make such awards presumably because of a lack of confidence in the jury's ability to distinguish between pain and suffering and loss of enjoyment of life *(see generally,* Comment, *Loss of Enjoyment of Life as a Separate Element of Damages,* 12 Pac LJ 965, 979-980 [1981]; *Thompson v National R. R. Passenger Corp.,* 621 F2d 814, *cert denied* 449 US 1035; *Pierce v New York Cent. R. R. Co.,* 409 F2d 1392). In *Pierce v New York Cent. R. R. Co. (supra),* involving a negligence claim brought on behalf of an eight-year-old boy who lost a foot when he fell under one of the defendant's trains, the United States Court of Appeals for the Sixth Circuit held that upon the trial without a jury Michigan law permitted the District Judge to make distinct awards for pain and suffering and loss of enjoyment of life. The *Pierce* rationale, similar to that employed in *McDougald (supra),* was that the recognition of the distinction between the two elements of damages facilitated the appellate process by delineating the basis of the trial court's decision and providing an additional safeguard against excessiveness. However, the Sixth Circuit in *Pierce* was not prepared to say that Michigan law would authorize, in the event of a jury trial, the submission of loss of life's enjoyments to a jury as an item of damages separate from pain and suffering.

The Sixth Circuit followed a similar approach in *Thompson v National R. R. Passenger Corp. (supra),* upon which the trial court in *McDougald (supra)* placed considerable reliance. *Thompson* involved the consolidated cases brought by passengers who sustained injuries in the derailment of an Amtrak passenger train. The Sixth Circuit affirmed a nonjury verdict granting separate awards of damages to compensate for the impairment of enjoyment of life and pain and suffering. In concluding that Tennessee law permitted such discrete awards, the court stressed the conceptual differences between the two elements of damages.

No logical purpose would be served by drawing a distinction between jury and nonjury trials in this context. We do not deem the reasoning required to distinguish between pain and

suffering and loss of enjoyment of life to be so sophisticated as to preclude placing the determination concerning the amount of compensation for each item of damages in the hands of a jury. A jury, if properly instructed, is fully capable of discerning between the two elements of damages. Indeed, as an element of general damages New York has already permitted juries to compute damages for loss of enjoyment of life. Little more than a semantical leap is required to bridge the gap between the existing decisional law and recognition of loss of enjoyment as an independent item of damages. The benefits to be derived from our determination herein can hardly be gainsaid. As noted by Justice Gammerman in *McDougald v Garber* (132 Misc 2d 457, *affd* 135 AD2d 80, *supra)* and reaffirmed by the Appellate Division, First Department, on appeal *(McDougald v Garber,* 135 AD2d 80, *supra),* carefully drafted jury instructions which convey the nature of loss of enjoyment of life and pain and suffering and their application to the facts of the particular case would avoid the danger of duplicitous awards of damages. Indeed, by requiring the jury to award separate monetary amounts for the various components of damages for personal injuries the court will have a better framework for reviewing the award and determining if it is excessive. It would further remove an element of speculation from the appellate process and thereby facilitate the appellate court's understanding of the various elements of the damages award. Furthermore, allowing separate awards would benefit the litigants by allowing them to ascertain the exact dollar amount awarded for each element of damages, thereby aiding in the decision as to whether or not to appeal an award of damages. The damages awarded in the instant case provide a persuasive example of the jury's ability to understand and follow instructions pertaining to the components of compensable damages. The amounts awarded by the jury herein for pain and suffering and loss of enjoyment of life, when taken as an aggregate, are clearly not excessive or duplicative.

Our conclusion is supported by several decisions in our sister State jurisdictions. The Nebraska Supreme Court in *Swiler v Baker's Super Mkt.* (203 Neb 183, 277 NW2d 697), while affirming a jury award of general damages, addressed the question of whether a separate damage award for loss of enjoyment of life was permissible and concluded that in certain circumstances the jury should be so instructed. The *Swiler* court stated that: "Loss of enjoyment of life may, in a particular case flow from a disability and be simply a part

thereof, and where the evidence supports it, may be argued to the jury. A separate instruction therein may be redundant. We do not recommend such an instruction be given, but find that under the facts of this particular case, where there is evidence from which the jury could find the injuries and resulting disability did cause loss of enjoyment of life, there was no error in giving the instruction, and we do not believe the jury was in any way misled" *(Swiler v Baker's Super Mkt., supra,* 203 Neb, at 187-188, 277 NW2d, at 700).

This language seems to suggest that an instruction to the jury to consider loss of enjoyment as a separate element of damages is appropriate in certain instances.

Similarly, in *Mariner v Marsden* (610 P2d 6 [Wyo]), which relied substantially upon the decision in *Swiler (supra),* the court held that loss of enjoyment of life is a compensable element of damages in addition to compensation for pain and suffering. That case involved an appeal in a negligence action by a Wyoming highway patrolman who suffered various facial, head and neck injuries as a result of an automobile collision. The Trial Judge, sitting without a jury, made a separate award to the plaintiff of $25,000 for loss of enjoyment of life. On appeal, the defendant contended that the award for loss of enjoyment of life was improper because it was cumulative to the award for pain *(Mariner v Marsden, supra,* at 7-8). Although the appeal was from an award after a nonjury trial, the appellate court followed an approach pursuant to which loss of enjoyment of life may either be taken into consideration in arriving at the total award of general damages or may constitute a separate element of damages *(Mariner v Marsden, supra,* at 12; *see also, Downie v United States Lines Co.,* 359 F2d 344, 347 [3d Cir 1966], *cert denied* 385 US 897; *Lebesco v Southeastern Pa. Transp. Auth.,* 251 Pa Super 415, 380 A2d 848; *cf., Sarauw v Oceanic Nav. Corp.,* 622 F2d 1168 [3d Cir]).

In the final analysis, the manner in which the loss of enjoyment of life is compensated is clearly a semantical problem. Carefully drafted jury instructions distinguishing pain and suffering and loss of enjoyment of life will prevent the duplication of damages and remove any degree of speculation concerning the amount awarded as to each element of damages. The plaintiff will also be ensured reasonable compensation for his injuries.

## B

Turning our attention to the defendants' remaining

challenge to the damages awarded to the decedent's daughter Jessica under the wrongful death cause of action, we do not find the recovery thereunder to be unduly speculative or excessive. Rather, we conclude that the amounts awarded for Jessica's pecuniary loss are fully supported by the record. On appeal the defendants specifically object to the award of $25,000 representing the cost of Jessica's future college education and the award of $75,000 to compensate for her loss of prospective inheritance. The damages recoverable in a wrongful death action are limited by statute to fair and just compensation for the "pecuniary injuries" suffered by the survivors of a decedent for whose benefit an action is commenced (EPTL 5-4.3). Such compensable damages are limited to the loss of support, services, voluntary assistance, the prospect of inheritance and medical and funeral expenses incidental to death *(Parilis v Feinstein,* 49 NY2d 984; *Odom v Byrne,* 104 AD2d 863, 864; *Fell v Presbyterian Hosp.,* 98 AD2d 624, 625). In determining the value of pecuniary loss, due consideration should be given to a variety of factors such as the decedent's age, sex, relationship to the person seeking recovery, earning capacity, life expectancy, health and intelligence, as well as the number and circumstances of his or her distributees *(see,* Rohan, Practice Commentary, McKinney's Cons Laws of NY, Book 17B, EPTL 5-4.3, at 497-498; *Fell v Presbyterian Hosp., supra).* Furthermore, because "it is often impossible to furnish direct evidence of pecuniary injury, calculation of pecuniary loss is a matter resting squarely within the province of the jury" *(Parilis v Feinstein, supra,* at 985).

In the present matter, there was proof as to the decedent's age, academic credentials and accreditation as a teacher coupled with the decedent's expressed intention to pursue her teaching career when Jessica entered nursery school. Testimony was also adduced from an economic expert who projected the loss of inheritance to be $290,000. As evidenced by its verdict of $75,000, the jury did not fully accept the expert's calculation as to prospective inheritance. With respect to Jessica's educational expenses, the plaintiff's expert projected that the cost of the child's future college education would require that the sum of $30,320 be immediately set aside. The jury awarded $25,000 which the defendants challenge as unduly speculative and duplicative of the damages awarded for loss of support. Under all of the circumstances, we find the jury's evaluation of the pecuniary loss suffered by the decedent's child to be supported by the evidence. Although the

computation is necessarily speculative to a degree, the evidence adduced provided a reasonable basis for the jury's award.

## IV

In conclusion, the judgment should be affirmed in its entirety.

BROWN, EIBER and SULLIVAN, JJ., concur.

Ordered that the judgment is affirmed, with costs.