■ NICHOLAS C. WINDISCH et al., Appellants, v CLINTON G. WEIMAN et al., Respondents.—Judgment of the Supreme Court, New York County (Michael J. Dontzin, J.), entered on April 12, 1989, which, following a partial jury verdict in favor of defendants Vincent Rizzuto, James F. Caravelli and Citibank, N. A. and upon the court's determination that no prima facie case had been made out against defendants Clinton G. Weiman and Stuart A. Sofferman, found in favor of the latter defendants and dismissed the complaint, is unanimously reversed on the law to the extent appealed from and the matter remanded for a new trial on those issues not determined at the first trial, without costs or disbursements.

In February of 1984, plaintiff Nicholas C. Windisch, a 34-year-old bank teller employed by defendant Citibank at one of its Manhattan branches, began to suffer from a hacking cough. Although he had been a heavy smoker for some eight years, he assumed he had an upper respiratory infection and unsuccessfully treated himself with over-the-counter cough syrups. He then consulted a local doctor, who prescribed some antibiotics. However, the cough grew more persistent and more racking and was soon accompanied by wheezing. By the end of March, plaintiff had begun to experience chest pains and dizziness. After blacking out at work on March 27th he was referred by his supervisor to the Citibank medical department where he was seen by defendant Dr. Vincent Rizzuto. Plaintiff complained of dizziness, palpitations and chest pain but, it is asserted by defendants, he did not mention having a cough. An EKG was thereupon administered, which appeared to be normal. No diagnosis was made or medication ordered, but plaintiff was instructed to return to work, quit smoking and return for a complete physical examination as soon as possible.

The follow-up visit was conducted at Citibank's health center on April 9, 1984. First, plaintiff was requested to answer a series of questions posed by the company's computer. Then a single X ray was taken of his chest from an anterior-posterior (front-to-back) view. The radiologist who subsequently read the X ray, defendant Dr. James F. Caravelli, found it to be normal, claiming that there was no indication of any bronchogenic carcinoma. Moreover, at the examination, plaintiff purportedly denied having any cough, sputum or phlegm or coughing of blood. He was again EKG'd and submitted to one second pulmonary function test, which he failed. The examining physician, defendant Dr. Stuart A. Sofferman, who never appeared at the trial (his deposition was entered into evidence), attributed the latter outcome to smoking. Plaintiff claims that Dr. Sofferman's examination was cursory, but defendants urge that no cough was apparent (plaintiff alleges that he coughed the entire time), that the lungs were clear, that wheezes were reported only seasonably or with allergies and that blood chemistry tests and urinalysis were performed with the results all being normal. In any event, Dr. Sofferman, deciding that there was nothing wrong with plaintiff aside from some reduced pulmonary function due to smoking, advised his patient to go back to work. The records of the medical screening were ultimately destroyed on the orders of defendant Dr. Clinton G. Weiman, the director of Citibank's health department.

On June 19th, plaintiff, still afflicted with coughing and chest pains, consulted Dr. Leonard Dinescu, an internist in private practice. Blood tests revealed a high white blood cell count, a sign of infection. Plaintiff declined to be hospitalized, as recommended by Dr. Dinescu, to ascertain the cause, but, on or about June 25, 1984, he did undergo a chest X ray and CAT scan arranged by the doctor. Although the tests showed the presence of a persistent dense lesion on the right lower lobe of his lung, plaintiff refused to be hospitalized for a bronchoscopy. Plaintiff was examined by another physician on July 25, 1984, Dr. Sidi Tuchfeld, a specialist in pulmonary medicine. A CAT scan of the abdomen did not reveal any abnormality, but a chest X ray indicated a right lower lung pneumonic infiltrate. Dr. Tuchfeld performed a reexamination on July 31st at which time plaintiff's breath sounds had improved, and there was a partial clearing of the right lower lobe lung infiltrate. However, since the chest X rays were suggestive of potential problems, Dr. Tuchfeld, on August 7th and again on August 15th, proposed that plaintiff undergo a bronchoscopy procedure. Yet plaintiff chose to wait. When he began to cough up blood, Dr. Tuchfeld once more suggested that he have a bronchoscopy, and this time he agreed. Accordingly, plaintiff was admitted to Beth Israel Medical Center on September 18, 1984 under the care of Dr. Ira Gould. The ensuing bronchoscopy revealed a mass on the wall of the bronchus intermedius, which, upon biopsy, turned out to be a squamous cell carcinoma. A large portion of plaintiff's lung was removed seven days later, and he received radiation treatment following his discharge from the hospital. His prognosis for long-term survival is grim.

Plaintiff commenced this action for medical malpractice against Citibank and various Citibank doctors who had examined him and failed to diagnose the lung cancer. At trial, he presented, in part, the testimony of his treating physicians and other expert witnesses, who criticized both the lack of a lateral X ray, the fact that no sputum cytology or other additional procedures were performed and that the medical center delegated patient interviews to a computer. All of these were characterized as constituting departures from good and accepted medical practice. While the witnesses admitted that only a bronchoscopy could provide a definitive diagnosis of carcinoma, and there was evidence that the X rays and July 25th CAT scan did not conclusively point to a malignancy, there was certainly ample testimony that Citibank's doctors should have done further tests which would have uncovered

the existence of the cancer. Indeed, the jury, in rendering its partial verdict by exonerating Dr. Caravelli, the radiologist who was employed full time reading X rays for Memorial Sloan-Kettering Cancer Center by day and did the same thing for Citibank at night, and Dr. Rizzuto, the emergency physician at Citibank's health service, found that both Dr. Sofferman and Dr. Weiman had committed medical malpractice. In that regard, the jury determined that Dr. Sofferman had departed from good and accepted medical practice in his examination of plaintiff on April 9, 1984 and in making the attendant diagnosis and that Dr. Weiman was negligent for approving the findings and recommendations of the medical report generated by plaintiff's visit of April 9th. However, the jury deadlocked on the issue of whether the malpractice of Dr. Sofferman and Dr. Weiman was a proximate cause of plaintiff's injuries. Since the jury was unable to resolve the proximate cause question, they never reached the matter of plaintiff's damages or the apportionment of damages between the defendants. Plaintiff thereafter moved for a new trial of the issues which the jury did not decide or, alternatively, for a new trial on all issues. Defendants then moved to dismiss the complaint on the ground that no prima facie case of proximate cause had been established. The court, apparently perceiving plaintiff's case to be "weak", granted defendants' motion to dismiss. This was in error. As the Court of Appeals stated in *Cohen v Hallmark Cards* (45 NY2d 493, 498-499): "[T]he Appellate Division has held that plaintiffs failed to present sufficient evidence to support the conclusion that Hallmark acted knowingly. In a jury case, the result of such an inquiry is of considerably greater significance than is a determination that a factual conclusion is against the weight of the evidence, for in the former case the result is a final judgment, while in the latter the result must be merely a new trial. Thus, the question whether a verdict is against the weight of the evidence involves what is in large part a discretionary balancing of many factors * * *. For a court to conclude as a matter of law that a jury verdict is not supported by sufficient evidence, however, requires a harsher and more basic assessment of the jury verdict. It is necessary to first conclude that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial. The criteria to be applied in making this assessment are essentially those required of a Trial Judge asked to direct a verdict. It is a basic principle of

our law that 'it cannot be correctly said in any case where the right of trial by jury exists and the evidence presents an actual issue of fact, that the court may properly direct a verdict' *(McDonald v Metropolitan St. Ry.,* 167 NY 66, 69-70; accord *Loewinthan v Le Vine,* 299 NY 372; *Wessel v Krop,* 30 AD2d 764). Similarly, in any case in which it can be said that the evidence is such that it would not be utterly irrational for a jury to reach the result it has determined upon, and thus a valid question of fact does exist, the court may not conclude that the verdict is as a matter of law not supported by the evidence".

Therefore, the standard to apply in ascertaining whether a party is entitled to dismissal for failure to make out a prima facie case has been described as follows: "To be entitled to judgment as a matter of law, the defendant movant has the burden of showing that plaintiff failed to make out a prima facie case; the plaintiff's evidence must be accepted as true, and plaintiff must be given the benefit of every favorable inference which can reasonably be drawn from that evidence * * *. The motion should be granted only if there is no rational process by which the jury could find for the plaintiff as against the moving defendant" *(Hylick v Halweil,* 112 AD2d 400; *see also, Vyse v City of New York,* 144 AD2d 452, 454). Defendants acknowledge that the relevant test is an any rational view of the evidence one and that, moreover, it is the jury's function to assess conflicting evidence and determine the credibility of the witnesses and the weight to be accorded expert testimony *(Kallenberg v Beth Israel Hosp.,* 45 AD2d 177, 180, *affd* 37 NY2d 719; *see also, O'Connell v Albany Med. Center Hosp.,* 101 AD2d 637, 638). Moreover, the issue of proximate cause is a matter to be decided by the jury *(Kallenberg v Beth Israel Hosp., supra; O'Connell v Albany Med. Center Hosp., supra).*

In the instant situation, the jury concluded that both Dr. Sofferman and Dr. Weiman departed from good and accepted medical standards in treating plaintiff, and an examination of the record demonstrates sufficient proof so that a rational view of the evidence would permit the jury to find that defendant's negligence was a proximate cause of plaintiff's disease progressing from one stage to another and, thus, not only necessitating more extensive surgery but drastically reducing his chance of survival. For instance, Dr. Ira Gould and Dr. William I. Wolff both testified to that effect. Finally, it should be noted that the failure of a physician to properly follow up a patient, resulting in a lack of a correct diagnosis

of cancer and an ensuing metastastic spread, may provide a basis for imposing liability even where the patient is partially responsible for the delay in diagnosis *(see, Nussbaum v Gibstein,* 138 AD2d 193, *revd on other grounds* 73 NY2d 912). Accordingly, the trial court was not warranted in granting defendants' motion to dismiss the complaint. Plaintiff is entitled to a new trial on those issues not resolved by the jury at the first trial. Since negligence has been decided, we remand for a determination of proximate cause, damages and the apportionment of damages. Concur—Sullivan, J. P., Milonas, Kassal, Wallach and Smith, JJ.